E-FILED
Friday, 10 March, 2023  09:23:15 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| MEREDITH DOWNES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 19-cv-1411** |
| | ) | |
| THE BOARD OF TRUSTEES OF | ) | |
| ILLINOIS STATE UNIVERSITY, | ) | |
| **Defendant.** | ) | |

## ORDER AND OPINION

This matter is now before the Court on a Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56 by Defendant The Board of Trustees of Illinois State University ("Defendant" or "ISU"). (D. 47[1]). Plaintiff Meredith Downes ("Plaintiff" or "Downes") filed this lawsuit asserting claims for wage discrimination based on sex and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the Equal Pay Act, 29 U.S.C. § 206(d). (D. 15). For the reasons set forth below, Defendant's Motion is GRANTED.

## BACKGROUND[2]

Downes has been a professor in the Management and Quantitative Methods Department ("MQM" or "MQM Department") in ISU's College of Business since 1997. ISU has three ranks of tenure-track professors: Assistant Professor (lowest rank); Associate Professor (intermediate rank); and Full Professor (highest rank). Downes started ISU at or around the time she was completing her Ph.D. as an Assistant Professor. In 2002, she received tenure and was promoted to Associate Professor. In 2009, she was promoted again to the highest rank of Full Professor and currently holds that position. At the time this lawsuit was filed, Downes was the only female

---

[1] Citations to the docket are abbreviated as (D. __.).
[2] To the extent possible, the information in the Background section is taken in the light most favorable to the Plaintiff.

tenured, Full Professor in the MQM Department. Despite her rank, Downes is also one of the lowest paid professors in the MQM Department.

## A. ISU's ASPT System

To fully understand the arguments made by the parties, an examination of ISU's salary structure and methodology is necessary. ISU's Faculty Appointment, Salary, Promotion and Tenure ("ASPT") System sets forth the "minimum levels of achievement necessary for sustained progress in the areas of Promotion, Tenure, Performance Evaluation, and Salary." (D. 15-2). Each Department at ISU has a Department Faculty Status Committee ("DFSC") charged with developing and administering department-level ASPT policies. *Id.* The MQM DFSC (hereinafter, "DFSC") is comprised of at least three elected faculty members and the MQM Department Chairperson, who is an ex officio voting member and DFSC Chairperson.

Pursuant to ISU's ASPT Policies, the DFSC is responsible for developing Department policies which reflect the MQM Department's own identity, mission, and culture, consistent with the standards set forth under ISU's ASPT System ("Department Policies"). (D. 47-15).[3] These include two sets of Department Policies: "(1) for appointment, reappointment, performance-evaluation, promotion, tenure review, and (2) allocation of monies devoted to salary equity adjustments and performance-evaluation increments." (D. 15-3, p. 11). The claims raised in this case relate to the latter set of Department Policies, specifically, money devoted to salary equity adjustments. (D. 15).

### 1. *Faculty Performance Evaluations*

The DFSC conducts annual performance evaluations of all tenure-track faculty members, making recommendations regarding pay raises based on their performance in accordance with the

---

[3] Department of Management & Quantitative Methods Illinois State University Appointment, Salary, Promotions & Tenure Policies, effective January 1, 2018.

Department Policies' criteria. The annual performance evaluation process includes: (1) an annual assessment of the faculty member's performance in teaching, research, and service; and (2) an overall assessment of as either "satisfactory" or "unsatisfactory." The DFSC provides one of the following ratings in each evaluation category (teaching, research, and service): (1) unsatisfactory; (2) standard raise; (3) raise beyond standard; and (4) exceeds raise beyond standard. Department Policies set forth the criteria necessary to achieve each successively higher rating. An overall assessment of "satisfactory" means the individual met or exceeded the minimum expectations.

The DFSC then provides each faculty member with a detailed letter including their overall assessment, rating and assessment in each evaluation category, and a raise recommendation. Faculty then has ten days to submit any appeals. Following the expiration of the appeal period, the DFSC submits the recommendations and performance evaluation to the College Faculty Status Committee ("CFSC"). The CFSC reviews the DFSC's reports and approves the recommendations in the report for consistency and conformity with Department and University policies. The CFSC then submits to the Provost its recommendation for performance evaluation of each faculty member, along with the DFSC's original reports.

Downes has no objection to any of her DFSC performance evaluation ratings and has consistently received a "raise above the standard raise" recommendation since 2009. (D.47-3, pp. 58-86). Despite these recommendations, she had the lowest average performance rating of all Full Professors in the MQM Department in 2014 and 2015, and one of the lowest in 2018.

2. *Salary Incrementation*

Each year the Provost informs faculty the amount of funds available to the ASPT system. The Provost allocates at least ninety percent of the salary funds directly to each Department/School for salary increments through the ASPT System. Pursuant to ISU's ASPT System, these salary

increments shall take the form of "(1) standard increments payable to all raise-eligible faculty members who receive overall satisfactory performance and (2) performance-evaluated increments that recognize contributions made by particular faculty members." (D. 15-3, p. 10).

Consistent with ISU's ASPT salary increment policies, the MQM Department Policies governing raises provide:

(1) 20% of the "available raise pool" (available raise pool = raise pool minus the 10% held by the Provost's office) will be distributed to raise eligible faculty as the university standard increment as per Section 7.2a and 2b of the University's ASPT guidelines. This amount will be distributed as an equal percentage of the base to all raise eligible faculty.

(2) The remainder of the "available raise pool" will be distributed as a DFSC standard increment to "raise eligible" faculty who maintain a level of intellectual contribution sufficient to be viewed as either "scholarly academic" (SA) or "professional academic" (PA) under AACSB standards as indicated below. This amount will be distributed as an equal percentage of the base salary. The distribution will occur as follows:

> If the remainder of the available raise pool (see above) is less than 3%, than 75% of this pool will be distributed as an equal percentage of base salary to all raise eligible faculty who maintain either SA or PA status under AACSB standards. The distribution of rest of the funds will be based on performance.

> If the remainder of the available raise pool (see above) is 3% or more, then 50% of this pool will be distributed as an equal percentage of base salary to all raise eligible faculty who maintain their SA and PA status under AACSB standards. The distribution of the rest of the funds will be based on performance and equity considerations. The allocation between performance and equity will be determined by a departmental vote at that time.

(D. 47-15, pp. 5-6, *MQM Depart. ASPT Policies*, eff. Jan. 1, 2018).

In summary, based on the forgoing policies, the three raise components used by the MQM Department are identified as follows: (1) the University Standard Increment; (2) the Department Standard and Performance Increment; and (3) the Provost Increment. *See id.*; *see also* (D. 47, p. 16, ¶ 80; D. 80, p. 2, ¶ 1). The University Standard Increment raise is awarded to all faculty who

received an overall assessment of satisfactory and is distributed as an equal percentage of their base salary. (D. 47, p. 16) (citations to the record omitted); (D. 80, p. 2). The Department Standard and Performance Increment is based on the DFSC's performance ratings and is calculated as a percentage of the faculty member's salary. *Id.* The Department Chair has no discretion in the distribution of these two raise components. *Id.*

Here, Downes does not take issue with any of her DFSC performance evaluations or University Standard Increment or Department Standard and Performance Increment raises. Rather, her wage discrimination claims target the Provost's Increment and prior chairs allocation of money devoted to equity adjustments. A primary point of contention stems from the parties' understanding of how the Provost's Increment is to be distributed. It is ISU's position that the Provost's Increment raise "has at times been used to reward top performers and at others to combat salary inversion and compression." (D. 47, p. 17). Downes disputes this, claiming the Provost's Increment has always been intended to only address equity considerations, specifically salary inversion and compression. (D. 80, p. 3).

Salary inversion and salary compression are systemic issues at ISU. "Salary inversion" is when new hires have higher salaries than longer-tenured faculty due to market factors at the time they were hired. "Salary compression" is when the salary gap between newly hired employees and current employees is small. As a result of market factors at the time an individual is hired, the parties agree many lower ranking, newly hired professors are paid more than higher ranking, tenured professors. For example, Downes agrees that at this time this lawsuit was filed she was the highest-ranking female professor in the MQM Department but had a lower salary than all the subsequently hired lower-ranking female professors.

While ISU denies the Provost's Increment has always been used only to address equity considerations, the parties agree that since 2018 the MQM Department has devoted the Provost's Increment to address the issue of salary inversion and compression. It is also undisputed that Downes has received among the largest allotment of the Provost's Increment among her colleagues since 2016.

## B. Additional Ways to Increase Salary

In addition to consistently receiving high DFSC performance evaluations, other ways faculty can increase their salary include promotion, obtaining the honorary designation of University Professor or Distinguished Professor, using a counteroffer from another school to renegotiate base salary, serving as Department Chair, and teaching summer courses. Here, Downes has not held a Chair position, received jobs offers from other Universities, or been awarded the distinction of University Professor or Distinguished Professor. She has, however, taught summer courses every year since 2009, except in 2016 and 2019.

### 1. *Summer Courses - Retirement Option*

A faculty member's salary is paid monthly, over a nine-month period. Historically, faculty members who taught a summer course received an additional month's salary.[4] Due to the limited number of summer courses available and high professor interest in teaching these courses, the MQM Department established a summer teaching rotation where professors are offered the opportunity to teach a summer course every other summer.

The MQM Department also offered a "Retirement Option" which allowed eligible faculty to teach four consecutive summers. The Retirement Option provided:

> 4. Retirement option – To be eligible for the 4-year retirement option (4 consecutive years at the top of the rotation of summer school), one must be tenured at ISU and meet one of the following two criteria:

---

[4] In 2021, summer pay was changed to 75% of the faculty member's monthly salary. (D. 47-6, p. 29).

1. Must have completed 15 years of service at ISU in a tenure track position.
2. Must have completed 10 years of service at ISU in a tenure track position and must be —at least 51 years of age.

Eligible faculty must notify the Department Chari [sic] in writing by the first Friday of the Fall semester preceding the summer which they wish to exercise the retirement option provision of the summer school policy.

(D. 47, pp. 28-29).

Dr. Roberta Trite was the MQM Department Interim Chair from January 3, 2017, to June 30, 2021. Prior to serving as the MQM Chair, she was in ISU's English Department. In the summer of 2017, Downes advised Trite that she wanted to exercise the Retirement Option to supplement her income while her daughter was in college during the summers of 2018-2021.

Downes was the first faculty member to submit a request to Trite to exercise the Retirement Option.[5] Trite investigated and did not discover any other mid-career faculty that had used the Option. She also consulted with Dean Samant, who started at ISU's College of Business in July 2016. They concluded that they needed to follow the intent and wording of the Retirement Option, and that to exercise the Option a faculty member must submit a written notice of intent to retire. Because Downes had no intent to retire, her request to exercise the Retirement Option was denied. To assist Downes in finding other summer work while her daughter was in college, Trite helped Downes find alternative summer teaching in ISU's overseas Panama Program. Downes taught in the Panama Program during the summers of 2018 and 2020.

In 2020 a new procedure went into effective eliminating any reference to retirement. The new procedure allows eligible, mid-career faculty to teach four consecutive summers one time in

---

[5] Downes claims Professor Gary Salegna used the Retirement Option while Trite was Chair and was not required to submit a written intent to retire. However, it is an undisputed material fact that Salegna exercised the Retirement Option during the summers of 2015-2018, and therefore Trite did not handle his request. It is also undisputed that Salegna retired shortly after exercising the retirement option. (D. 47, p. 30, ¶ 159; D. 80, p. 2, ¶ B. (1)).

7

their career. After the new procedure was enacted, Trite offered the option to Downes starting in 2020. Because Downes had already secured a summer course, she deferred exercising the summer option until 2021. She taught a summer course in 2021 and 2022 and plans to teach a summer course in 2023 and 2024.

### C.  MQM Department

While not the subject of this litigation, by 2016 MQM Department had a contentious environment. Downes started her career with a strained relationship with John Lust, who served as the MQM Department Chair from 1997-2007. She also had issues with John Bantham, who was Chair from 2012-2014. Downes finally had a good relationship with Alex Barelka, who served as Chair starting in 2014. However, Barelka was terminated from the position in December 2016. Lust and Bantham were among the individuals advocating for Barelka's removal.

Trite replaced Barelka as Interim-Chair in January 2017. When she inherited the position there were numerous ethics and grievance cases pending between the faculty members. (D. 47-6, p. 20). This included a complaint filed by Downes with ISU's Office of Equal Opportunity and Access in December 2016, just prior to Barelka's removal. Her complaint was against Lust and Bantham alleging she had been subjected to gender discrimination since she started at ISU. Her allegations included Lust yelling at her for missing a department meeting in 1997, prematurely telling people she was pregnant in 1998 which she claims attributed to a subsequent miscarriage, and being verbally abusive and hostile towards her. (D. 47-5, pp. 49-55). Her complaints against Bantham were less severe. *Id.* at pp. 54-55. ISU ultimately dismissed Downes' complaint and no appeal was filed. *Id.* at pp. 22-23.

At or around this time, Downes also learned she was one of the lowest paid professors in the Department. Trite met with Downes numerous times to discuss her concerns regarding her

compensation, the gender balance in the MQM Department, and an ethics grievance case filed by another female professor against Downes relating to that professor's tenure and promotion while Downes was a DFSC faculty member. During one conversation, Downes told Trite that John Lust had been abusive to her. In response, Trite told Downes that her statements about Lust could be actionable slander.

## PROCEDURAL BACKGROUND

Downes filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") alleging discriminatory practices based on gender in violation of Title VII and the Equal Pay Act. (D. 15, p. 1). On September 25, 2019, the EEOC issued a "Dismissal and Notice of Rights Letter" denying her claims on the grounds that it was "unable to conclude that the information obtained establishes a violation of the statutes." (D. 15-1). The EEOC letter notified Downes that she had ninety-days from receipt of the letter to file a lawsuit against ISU based on her discrimination charge, and that any Equal Pay Act claim must be filed within two years (three years for willful violations) of the alleged Equal Pay Act underpayment. *Id.*

On December 20, 2019, Downes filed a Complaint against ISU alleging violations of Title VII (Count I) and the Equal Pay Act (Count II). (D. 1). On June 23, 2020, an Amended Complaint was filed containing the same two counts but substituting The Board of Trustees of Illinois State University as the sole Defendant. (D. 15). ISU has filed a motion for summary judgment. (D. 47). The matter is fully briefed, and this Order follows.

## LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." \*Hemsworth v.*

9

*Quotesmith.com*, 476 F.3d 487, 489-90 (7th Cir. 2007); Fed. R. Civ. P. 56. "In deciding motions for summary judgment, courts must consider the evidence as a whole," *de Lima Silva v. Dep't of Corrs.*, 917 F.3d 546, 559 (7th Cir. 2019), and "view[ ] the record and all reasonable inferences . . . drawn from it in the light most favorable to the nonmoving party," *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018). However, the court will not draw inferences that are "supported by only speculation or conjecture," *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003). A party who bears the burden of proof on a particular issue must affirmatively demonstrate, with specific allegations supported by appropriate citations to relevant admissible evidence, that a genuine issue of material fact exists. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994).

It is not the role of the [c]ourt to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment." *Aberman v. Bd. of Educ. of City of Chi.*, 242 F. Supp. 3d 672, 685 (N.D. Ill. 2017) (citing *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008)). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations omitted). Employment discrimination cases are "extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Greere v. Bd. of Educ. of City of Chi., Ill.*, 267 F.3d 723, 727 (7th Cir. 2001).

## DISCUSSION

As a preliminary matter, this Court finds ruling on ISU's motion for summary judgment has been complicated by Downes' failure to comply with the Central District of Illinois' Local Rules. Local Rule 7.1(D)(2)(b)(2)-(3) states every disputed material and immaterial fact "must be supported by evidentiary documentation referenced by specific page." Any filing not in compliance may be stricken by this Court. C.D. Ill. Local R. 7.1(D); *see also Waldridge* 24 F.3d at 923-24. Compliance with Local Rule 7.1(D) not only benefits the parties by clarifying exactly what is in dispute and on what evidence they rely, but also greatly benefits the court which does not have the same familiarity with the record as the parties. *See id.*

Here, Downes makes factual allegations in her response that are often unsupported by the referenced documentation she relies on. For example, she attempts to refute ISU's assertion that the Provost's Increment raise was at times based on performance and at other times used to combat salary inversion and compression, but only cites her deposition testimony where she confirms that she has never been involved with decisions relating to distribution of the Provost Increment. (D. 80, pp. 2-4, ¶¶ 83-85, 92, 94, 103, 110, 119, 125 (citing D. 47-2, p. 39, *Plaintiff's Jan. 2022 Dep.* 149:6). ISU produced Department Policies regarding raise distribution and the testimony of department chairs who were responsible for distributing raises, supporting the fact that the Provost's Increment may be based on performance or equity. Downes cited deposition testimony did not dispute that fact at all, but merely confirmed she was never involved in the decision making.

Downes also cites evidence from the record to support certain factual allegation that do not support the allegation at all or are an unfair or incomplete summary of the record. (D. 80, pp. 3-5, ¶¶ 94, 155, 158, 160). Specifically, Downes implies Roberta Trite allowed another male professor to exercise the Retirement Option without submitting a written intent to retire, when in fact Downes' request to exercise the Option was the first one Trite received as the MQM Department

Chair. Downes also claims other mid-career male professors were permitted to use the amended four-year summer option a year before her. While true, Downes fails to make clear that this was after the procedure changed eliminating any reference to retirement and that Trite offered the option to Downes as soon as the new procedure went into effect, but she declined because she already had a summer course for that summer. Downes also relies on an exhibit she created between her January 2022 and February 2022 depositions (*Plaintiff's Feb. 2022 Dep. Ex. 29*), purportedly based on personal notes she took after this lawsuit was filed and that she destroyed or could not otherwise produce. *Id.* at p. 12; *see also* (D. 47-5, pp. 3-4).

> Rule 56 of the Federal Rules of Civil Procedure instructs:
>
> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record," or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact . . . . If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]

Fed. R. Civ. P. 56(c)(1), (e)(2).  In short, Downes has made factual allegations in her response brief that do not have evidentiary support. The Court cannot consider these unsupported allegations as facts. Accordingly, in instances where Downes only has unsupported allegations, the Court credits ISU's versions of facts, which they have supported with evidence from the record. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994) (affirming decision of district court which assumed the facts as claimed and supported by admissible evidence by the moving party were admitted to exist without controversy); *Thomas v. Kroger*, No. 13-CV-00588, 2014 WL 555086, at *1 (S.D. Ind. Feb. 12, 2014) ("Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.").

The briefing and designated evidence in this case are lengthy, and the burden is on the parties to bring relevant information to the Court's attention — the Court will not search for the record to find the material facts that Downes asserts are in dispute. Accordingly, the Court will strike Downes' denial of the material facts asserted in paragraphs 83, 84, 85, 92, 94, 103, 110, 119, 125, 155, 158, and 160, as non-compliant with this Court's local rules and Fed. R. Civ. P. 56. The Court will deem those facts admitted and undisputed. The Court further finds Downes has not substantiated *Plaintiff's Feb. 2022 Dep. Ex.* 29, and therefore, it is stricken.

Because the Court reviews the record in the light most favorable to Downes, it will consider Downes' "Additional Material Facts" to the extent they are supported by admissible evidence and are  relevant. Because Downes relies only on  *Plaintiff's Feb. 2022 Dep. Ex.* 29, which has been stricken in support of paragraphs the Exhibit  in support of paragraphs 3 and 4 of her Additional Material Facts, those paragraphs are also stricken.

### A.  Disparate Pay Claims

Downes' wage discrimination claims are premised on two federal statutes: the Equal Pay Act and Title VII. The Equal Pay Act  prohibits an employer from discriminating against employees based on sex "for equal work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] … sex." 42 U.S.C. § 2000e-2(a)(1). A *prima facie* case under Title VII requires a showing that: (1)

the plaintiff is a member of a protected class; (2) she is performing her job satisfactorily; and (3) she suffered an adverse employment action, in that she was treated less favorably than at least one "similarly situated" male colleague. *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 274 (7th Cir. 2004); *Lim v. Trus. of Ind. Univ.,* 297 F.3d 575, 580 (7th Cir.2002). The failure to satisfy any one of these elements is fatal to a plaintiff's claim. *See Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008). If plaintiff establishes a prima facie case, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the decision. *Lim,* 297 F.3d at 580. Once the defendant satisfies its burden, the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual. *Id.*

Considerable overlap exists between the Equal Pay Act and Title VII, but they are generally distinguishable in who carries the burden of proof. In both Equal Pay Act and Title VII claims, the plaintiff bears the initial burden of proof of establishing a *prima facie* case that pay discrimination occurred. *Kellogg v. Ball State University*, 984 F.3d 525, 530 (7th Cir. 2021). But unlike the burden-shifting framework for Title VII claims, if the plaintiff establishes a *prima facie* case under the Equal Pay Act and the employer is unable to attribute the disparate pay to one of the four statutory defenses, the plaintiff will prevail. *Id.*; *see also, Fallon v. State of Ill.*, 882 F.2d 1206, 1203 (7th Cir. 1989).

1.   *Equal Pay Act Claims*

To prevail in an Equal Pay Act action, the jobs of women and men for which pay is unequal must be substantially equal in terms of skill, effort, responsibility, and working conditions. *Cullen v. Indiana University*, 338 F.3d 693, 698-99 (7th Cir. 2003). Here, Downes has failed to establish she is performing "equal work" to that performed by comparably employed men. Downes has identified the following male Full Professors in the MQM Department as comparators: Askar

Choudhury, Elango Balasubramanian, Jim Jawahar, Victor Davinatz, Richard Ringer, and Mark Hoelscher. Downes earned a lower salary than all of them, except Richard Ringer.

Other than holding the same title, all the above referenced males are distinguishable from Downes in skill level. "Skill includes consideration of such factors as experience, training, education, and ability." 29 C.F.R. § 1620.15(a). Davinatz is a Distinguished Professor, and Jawahar and Balasubramanian are University Professors. The honorary designations of "University Professor" and "Distinguished Professor" exist to enable the University to honor individual facility members for their academic achievements and demonstrate to both the University and broader community that excellence is the foundation of ISU.

To be eligible for appointment of University Professor a person must hold the rank of Professor, either at ISU or another institution, and must have achieved distinction in one of the following areas: (1) national recognition for research, production, or leadership in creative or scholarly activities; and (2) the individual must have been clearly identified by students, colleagues, or external agencies as an outstanding teacher. (D. 47-12, p. 1). University Professors continue to hold their rank in an academic department, receive $2,500.00 added to their base salary, plus a one-time award of $1,000.00 to use toward future activities of the recipient. University Professors will hold their title throughout their years of service at ISU, unless awarded the title of Distinguished Professor.

 Distinguished Professor is the highest academic honor bestowed by ISU. To be eligible for appointment a person must: (1) hold the rank of Professor at ISU; (2) have achieved national or international recognition for research, creative production, or leadership in creative or scholarly activities; and (3) have either been identified as an outstanding teacher or have contributed significant public service in accord with their academic discipline. (D. 47-13, p. 1). Distinguished

Professors receive $5,000.00 annually in addition to their base salary, and a minimum $1,000.00 budget per annum to support activities as Distinguished Professor. *Id.* Distinguished Professors will hold ten-month appointments for two years but may hold the title throughout their years of service to ISU. *Id.* Downes testified that she has not been nominated for either honorary distinction and does not believe she meets the qualifications to receive them.

Jawahar also served as the MQM Department Chair from 2008-2012, and then took a position as the Associate Provost from 2012-2018. He received a salary increase with each position. When he returned to the MQM Department in 2018, he retained his higher monthly salary from the Provost's Office. Hoelscher served as the Director of Means Center for Entrepreneurial Studies from 2000-2019, and Ringer served as the Director of Organizational Leadership from 2000 until he retired in May 2022. These positions were leadership roles, which they held for a considerable amount of time, and included administrative duties beyond their professor roles. Based on the foregoing, the other tenured, Full Professors have positions distinguishable from Downes, in that they require different skills, effort, and responsibility.

Even assuming Downes established a prima facie case, which she did not, the burden of persuasion shifts to ISU to prove one of four statutory affirmative defenses. *See* 29 U.S.C. 206(d)(1). ISU relies on the defense that there exists "a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv). Unlike Downes, Choudury, Balasubramanuan, and Jawahar came to ISU with completed Ph.Ds., prior teaching experience, and multiple publications. These factors increased their starting salary amount. Additionally, Choudury, Balasubramanian, Jawahar, and Hoelscher all started teaching at ISU after Downes. ISU spends a significant amount of time explaining how market forces effect the starting salaries of later hired professors. The parties agree that it is common in the education industry for new faculty to be hired at a higher salary than

tenured faculty. When referring to market forces in this context, it means ISU must compete to get new talent with Ph.Ds. as Assistant Professors. This is especially true in the MQM Department, were there are a limited candidates with the requisite Ph.Ds. available for hire each year. To attract these individuals, ISU explains that it must offer a competitive starting salary.

In addition to the role market factors play in the starting salary awarded, ISU uses a merit-based system to determine raises in the areas of teaching, research, and service. While Downes does not dispute any of her performance evaluations and she often received above standard ratings, many of the other Full Professors consistently received higher performance ratings than Downes. The exceptions are Professors Salegna and Ringer, who had similar or lower ratings, and often had a lower salary than Downes. As a result, this Court finds ISU's merit-based system was used to determine raises, and not Downes gender.

As discussed at length above, an individual's base salary is the primary factor in calculating their raise. That amount is used to determine the amount the individual will receive under each of the raise components. These considerations, in addition to the factors listed above that result in salary increases, support ISU's position that there is a valid reason other than sex to pay these individuals more than Downes.

2. *Title VII*

a. *Wage Discrimination*

Having addressed Downes' Equal Pay Act argument, the Court turns to her Title VII claim. Here, there is no dispute that Downes is a member of a protected class. ISU also does not provide argument that her job performance was not meeting her employer's legitimate expectations. Accordingly, for purposes of summary judgment, the first two elements of a prima facie case have been established. Downes claim fails under Title VII because she has not presented evidence that

17

a similarly situated male was treated more favorably, as discussed above. Rather than present evidence in support of this fact, Downes simply states in her response that "[t]here can be no dispute that DOWNES has established her prima facie case for gender discrimination." (D. 80, p. 15). She then goes on to argue that the burden is therefore shifted to ISU to provide a legitimate reason she is paid at a lesser rate of pay than her male colleagues.

Downes claims her salary has failed to increase at the same rate as her male colleagues due to prior department chairs utilizing the ASPT and Department Policies to impose adverse treatment in its distribution of the Provost's Increment raise component. To Downes' detriment, the record contains ample evidence that the Provost's Increment raise component may be distributed based on either performance or equity considerations. This is supported by both Department Policies governing raise distribution, and the testimony of prior department chairs who were responsible for distributing raises. Department Policies state, in relevant part:

> If the remainder of the available raise pool (see above) is 3% or more, then 50% of this pool will be distributed as an equal percentage of base salary to all raise eligible faculty who maintain their SA and PA status under AACSB standards. *The distribution of the rest of the funds will be based on performance and equity considerations.* The allocation between performance and equity will be determined by a departmental vote at that time.

(D. 47-15, pp. 5-6, *MQM Depart. ASPT Policies*, eff. Jan. 1, 2018) (emphasis added). Because Downes has no issues with any of her performance evaluations, she does not have a claim for adverse employment action the years the Provost's Increment was distributed solely based on performance. Furthermore, Downes has stipulated she has received amongst the largest allotments of the Provost's Increment among her colleagues since 2016, and that it has been devoted solely to correcting salary inversion and compression since 2018. (D. 47, p. 17; D. 80, p. 2).

18

Similarly, Downes has failed to present a similarly situated male colleague that was allowed to exercise the "Retirement Option" with no intent to retire. While she points out that Salegna was not required to submit a written intent to retire before being allowed to exercise the option, he did intend to retire after completing the Retirement Option. She also points out that the Department denied another male professor's request to exercise the Retirement Option because he missed the deadline to apply to exercise the Retirement Option. The Court fails to see how he was treated more favorably than Downes, as he also was not allowed to exercise the Retirement Option. For the reasons stated above, the professors that were allowed to use the procedure after it was changed are also not similarly situated males that were treated more favorably than Downes.

Even assuming she had met her prima facie burden, Downes has failed to introduce evidence to create a material dispute regarding pretext. ISU has provided unrebutted, nondiscriminatory reasons for the pay disparity, including such as market factors based on the time of hiring, different credentials, and differences in additional roles other Full Professors have taken on that have increased their salaries. Consequently, Downes cannot prevail on her Title VII wage discrimination claim.

b. *Retaliation*

Downes also argues she was the subject of retaliation for expressing concern to Trite about earning less than her similarly situated male colleagues. (D. 15, p. 5). Specifically, Downes claims she told Trite that this practice began under John Lust and has been a continuing harm. *Id.* The retaliation, she contends, was that Trite dismissed Plaintiff's concerns and suggested that Plaintiff's comments could be the basis of a defamation suit against Plaintiff. *Id.*

To defeat summary judgment, Plaintiff must offer evidence from which a reasonable jury could find that she : (1) engaged in protected activity; (2) suffered an adverse employment action;

and (3) a causal connection exists between the two. *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017); *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). The evidence must be considered as a whole, with all relevant evidence being considered and irrelevant evidence being discarded. *Ortiz*, 834 F.3d at 765. Defendant argues Plaintiff has failed to establish all three factors.

ISU argues "the record *does not clearly show* that Plaintiff…complained to Trite about gender-based discrimination." (D. 47, p. 53) (emphasis added). Rather, ISU claims Downes' own testimony shows that she approached Trite regarding her salary concerns, which merged into her airing grievances about John Lust's abusive treatment of her. *Id.* There is no clear evidence that the two topics were referenced in connection to each other. In response, Downes claims ISU's argument that the record "does not clearly show" that Plaintiff did not engage in a protected activity, is the equivalent of ISU admitting a factual dispute remains on this element. (D. 80, p. 26). Downes offers no further evidence or argument in to support that she was engaging in a protected activity under Title VII.

Downes testified that she had told Trite, at some point, that she thought Lust was abusive to her because of the things he had said to her. (D. 47-2, p. 23, Plaintiff's Dep. p. 85). Trite responded saying Downes' allegations could result in Lust having a legal cause of action against her. Other than Plaintiff's statement to Trite that she felt Lust was verbally abusive, there is no evidence that Plaintiff expressed or otherwise inferred to Trite that Lust discriminated against her because of her gender. "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 663 (7th Cir. 2006) (internal citations omitted).

Even assuming, arguendo, that Plaintiff had engaged in a protected activity, her retaliation claim still fails because she cannot prove an "adverse employment action." Title VII protects employees from retaliation that produces an injury. Here, and Trite's warning to Downes that her telling people another professor abused her may create a private legal right of action with him does not qualify as retaliation *See Poulard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Furthermore, there is no evidence that Trite intended to tell Lust or otherwise took adverse disciplinary action against Downes. In fact, the record shows the opposite.

Downes continued to retain her rank as Full Professor. There is no evidence of an adverse change in Downes's teaching, research, or service activities. In fact, Trite continued to work with Downes to secure summer teaching opportunities and leaderships roles in ISU's Panama program. This resulted in additional income for Downes. Trite also facilitated a committee being formed to amend the Retirement Option in 2019, so that the criteria necessary for exercising the Option was clear to all faculty and could be uniformly enforced by department chairs. Once the new procedure went into effect, Trite offered it to Downes.

The DFSC also continued to recommend Downes receive a "raise beyond the standard" in 2019 and 2020. (D. 47-3, pp. 78-80). In May 2019, Trite nominated Downes for the Outstanding University Teaching Award. (D. 47-6, p. 54). In September 2019, Trite recommended Downes for the Hinderliter Endowed Professorship. *Id.* at 57. Although she did not win either of these awards, it is clear Trite continued to be an advocate for Downes' professional growth. Finally, Trite continued to exercise her discretion to allocate the Provost Increment to address equity consideration, which she knew would result in Downes receiving one of the largest allotments of that raise component.

21

Accordingly, no reasonable jury could conclude Plaintiff suffered retaliation due to Plaintiff's complaint to Trite regarding Lust's treatment of her, and Defendant's Motion on this ground is GRANTED.

<strong>CONCLUSION</strong>

For the reasons stated above, Defendant's [47] Motion for Summary Judgment is GRANTED, The Clerk is DIRECTED to enter judgment in favor of Defendant and against Plaintiff. The case is now TERMINATED. The Clerk is DIRECTED to close this case.

ENTERED this 9th day of March, 2023.


/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge